May it please the Court. My name is Jason Monteleone. I'm an attorney in Boise, Idaho. I represent the appellant, Chairman Brockbank, in this matter. This case is before you, Justices, on the grant of summary judgment in an age and gender discrimination case. From reviewing the briefing and preparing for today, there are two items, I believe, that may be somewhat confusing, and I want to clarify those right from the outset. The only stated reason from the bank for the plaintiff's termination was her alleged misuse of the company credit card. There's no issues relative to job performance. There's no issues relative to the adequacy of her efforts to generate new business as a trust officer for the bank. The sole reason for the termination was the alleged misuse of the company credit card. The second item that might be somewhat confusing from the briefing is Michael Sullivan, the plaintiff's immediate supervisor, was clearly involved in the decision to terminate Sharon Brockbank. It was admitted in discovery. It was recognized in answers to interrogatories that Mr. Sullivan played a direct role in the termination of the plaintiff. Scalia. Who actually was the final decision-maker? I believe it was Mr. Sullivan. He had to validate what Human Resources had suggested. Human Resources ---- Who signed off on it? Sullivan? Mr. Sullivan. That's correct. With those two ---- So HR initiated the investigation, though, correct? And your contention is the record reflects that at some point Mr. Sullivan got involved in that process. That is correct, Justice. When is the factual record shows Human Resources initiates an investigation, Darlene Bills undertakes that investigation on behalf of the bank's HR, and then there's a meeting with Ms. Bills, Mr. Sullivan, and my client, and during that meeting, the termination decision is made, Mr. Sullivan signs off on it. So what does Sharon Brockbank need to show in order to have her day in front of a jury? The law is pretty clear. There's been a lot of ink spilled in this area. She needs to show her prima facie case, and then if she does not have sufficient direct evidence, she needs to be able to show pretext and that the stated reason from the employer was false. Here, in the record before this Court, there is ample evidence, both direct and circumstantial, that Ms. Brockbank was subjected to age discrimination in employment. Could we pause right there and look at the test for age discrimination? I want to make it clear precisely what your position is on the fourth prong of that prima facie case. Is it that she was replaced by a younger person, as you say at page four of your reply brief, or is it because she was discharged under circumstances that were, as Sister points out at page 20 of her brief? Which of those articulations is the appropriate one under the law of this circuit? As I understand it, and candidly, either one. However, in our briefing, we pointed out, because it seemed to be the clearest path to the goal, that she was replaced by someone substantially younger. And so we're primarily arguing that that is the fourth prong. And you think that is the clearer path? I do. Perhaps you could tell me why. Because there's very straightforward evidence that after Ms. Brockbank was terminated, her trust accounts were divvied up to the very employees significantly younger than her, that it had all the Plum New accounts funneled to them at the expense of Ms. Brockbank. It's straightforward in the record that the only trust officer near an age to Ms. Brockbank, Rita Snodgrass, received none of the trust accounts after Ms. Brockbank's termination. So while I do believe the fourth element, being replaced by a younger employee, is a more straightforward and clear path to the goal my client seeks, I do think either fourth element would be the law in this circuit, because it ends we end at the same location. All roads do lead to Rome. If there's age discrimination, there's age discrimination. Am I correct that there was only one person eligible to take over her accounts who was approximately her age? Everybody else was younger. Is that correct? Significantly younger. That's correct. Ms. Snodgrass, you're saying she received no accounts or none of the Plum accounts? She, following Ms. Brockbank's termination, and the bank needed to dole out the existing trust accounts, Ms. Snodgrass, the only employee near an age to Ms. Brockbank, received basically none of the accounts. The accounts went to Greg Powers, Greg Oz, and Ms. Williamson. And all three of those employees, it's incontroverted, were significantly younger. I'm not sure that it matters to the argument you're making, but do we know when they filled the position a year later, what is the age of Hagel, is it? Your Honor, I do not have that information. I didn't see it in the record, and I didn't want to make sure I didn't miss it. I don't know that information. The reality, though, is on the age part of this case, we have statements from an individual that this employee dresses too young for her age. She looks ridiculous for her age. She has an image that we don't like for our bank. Do we know precisely when those statements were made? We know with more than a reasonable degree of certainty they occurred over the time frame of early 2003 to late 2007. So here we have an individual, Mr. Sullivan, who is making these age-based statements over a significant period of time. We're not talking about isolated, stray remarks. They're said on multiple occasions over a five-year span. An inference from that, an inference to which Ms. Brockbank is entitled, is this is someone who holds this negative age-based animus for quite some time and has not been able to shake it. When you get down to the brass tacks, why do we have a supervisor making all of these statements and taking this special and somewhat curious interest in a subordinate employee that has nothing to do with her job performance? That lends an inference that it's age-based. You couple it with the fact that Melody Rogers, Mr. Sullivan's She was asked to spy on Ms. Brockbank. We have evidence that Mr. Sullivan made the statement, he was out to get Ms. Brockbank. And as cited in our opening brief, the Staub v. Proctor Hospital, that leads to the inference that there's a discriminatory intent afoot. Relative to pretext, the district court found that there was not a genuine issue of material fact on pretext. However, the stated reason from the bank is that they terminated this employee due to alleged misuse of the company credit card. During discovery, the factual record that was developed is that the very superior that terminated her had put a $1,000 alcohol tab in Chicago on his company credit card, clearly a violation of the bank's policy. That he had purchased gifts for clients, clearly a violation of the bank policy. That he had put pet food and a pizza on his bank credit card, clearly violations of the policy. So the individual who we've asserted was the primary discriminator is doing the exact same things that the bank uses to justify the termination of this employee. With her so -- Kagan. Do we know how old Mr. Sullivan is? I didn't see that in the record. As I recall from his deposition, Justice, when he's early 50s, so at the time of the termination, he was late 40s. The thing about it is there's a second shoe that needs to drop in the pretext analysis, and that second shoe to drop is all of the charges that the bank says were violations of its own internal credit card policy were explained away. These retail establishments, charges to Walmart, Chevron, Fred Meyer, they were all used for Ms. Brockbank to service her various branches during a summer campaign known as Financial Freedom Days. That part of her job required her to pick up the She was using her credit card appropriately. That's clearly business-related purchasing. Then, after she picks up these items, she also is working with these various branches. The policy at the bank is she's supposed to receive the new trust accounts that come out of those branches. Well, Mr. Sullivan doesn't follow that policy. The new trust business that's coming out of the branches, Ms. Brockbank Services, should have been her business, but he diverts it from her. That's additional circumstantial evidence of a discriminatory intent. Pretext evidence is in the record. It was not proper for the district court to grant summary judgment on that basis. Scalia. Does the record show with any explicitness whether any of the company permitted any other employees, any specific employees, to charge personal expenses to their credit card? And if so, or at least did not discharge them? Yes, Justice Ripple. I believe the record's clear that Mr. Sullivan himself made those charges. It was never terminated. Beyond Mr. Sullivan. I'm trying to find out whether there was some kind of corporate policy here. The best evidence in the record to address your question would be the deposition of Jennifer Hogeboom, who stated in her experience, after 25-plus years with the Bank, a slew of employees had used their company credit cards for personal reasons and had not been terminated. And that's probably the best evidence in the record to address that point. Did she give any explanation as to why they had not been terminated? No. She was not in HR. She was, I believe she was an administrative assistant in the trust department or in the related department on the other side of the house. But no specific examples. And what did the corporate representative say in her deposition about the one of the one of there was some testimony that there was a fairly clear distinction between people who had made singular mistakes and people who had done it with some frequency. And certainly that's the Bank's position, that we are forgiving if it's an isolated mistake, but I don't believe the facts have shown that. I think that there was widespread misuse of the company credit card, and there was no disciplinary action taken against any other employees then Sharon Brock Bank. Latent discovery. No, the record does not show that any other employee was discharged. It shows that there were two other employees, one of whom was discharged after Ms. Brock Bank, so that's not relevant, and one who was discharged before. But all of that came out so late in the game in discovery, it wasn't even really part of the summary judgment proceedings. It was an affidavit that came out. But somehow I thought three people were terminated. Yes. And the three people are the one who was terminated after Ms. Brock Bank in 2010. Right. She's irrelevant. Then there was a two other ones. I can't recall precisely. There were two that were before, but one they weren't an affidavit from Ms. Bills, the HR director. When I deposed Ms. Bills, she couldn't identify those two people. So then an affidavit comes in to support the bank summary judgment, and these two new employees are identified. By this time, discovery is closed. I had no opportunity to look further. But when I deposed Ms. Bills, the HR individual, she said, I can't identify a single other employee. And what about there was some reference in the record to some other people that had been identified as using the credit card, Reisner and Rudd, and what was the name of And was there documentation that they actually used credit cards, but not solely for bank business? There was no documentation on it. There was testimony. Okay. And that's in the record. But the documentation So there's testimony that they used it for nonbusiness purposes, but also they obviously weren't terminated. They were still employed by the bank. Right. And I do think Ms. Hogeboom's testimony that there is a slew of this occurring. That was the term she used. It's probably the best evidence on this point. With waiting time, I simply leave this Court What was the basis of that remark? In the testimony, what was the basis of her remark, that there was a slew? Did she see these? Twenty-five years of employment with the bank. Yes. And seeing it. Doing what? And seeing it. Talking to her coworkers, just being within the can of 25 years with the company and knowing what's occurring. She didn't review these or anything? That wasn't part of her job duties. No, that's true, Justice Ripple. As has been ruled on both by yourself, Justice Ripple, and you, Justice McAllen, when there's a grant of summary judgment in an employment law case, we need to have heightened scrutiny and use additional rigor in reviewing this record. Plaintiff submits that as appellant, this Court should reverse because there is ample evidence on the prima facie case, both direct and circumstantial evidence of the discrimination, and there's ample evidence of pretext. Let me just ask a question. I'll give you some time for rebuttal. Let's say we agree with you that there's a factual issue on the pretext. As a practical matter, when you go to trial, if discovery is closed, and I take it you didn't ask for 56F for further discovery at this stage, then this is the evidence that would go before the jury, the same evidence that we have. Is that right? The evidence that's before you, there are two witnesses that we don't have affidavits we got position from. They'll only be subpoenaed for trial, but it's not in the record currently. So I do believe there would be additional evidence at trial that would support my client's cause. However, it's not before you. Thank you. Thank you. Good morning, Your Honors. My name is Pat Olson. I'm representing U.S. Bank Corps in this matter, which I'll refer to as U.S. Bank. Please excuse the brace on my arm. I didn't get it from Mr. Monteleone. We are at Schedule Surgery. May it please the Court and counsel, I'm here to represent U.S. Bank and the District Court of Idaho in asking this Court to affirm the summary judgment rendered in this case. And I'd like to address a couple of the questions that my counsel that my colleague answered in response to questions posed. First of all, I want to address Judge Ripple's question about the testimony that there were a slew of employees who had not been terminated, yet had misused their corporate credit cards. That was simply a conclusory statement by an employee with no personal knowledge and is not of any evidentiary value. I now want to explain a little bit about how this corporate credit card policy works and how it is enforced. Employees at U.S. Bank Corp., who are in certain positions of trust, and the plaintiff in this case, Brock Bank, worked in the trust department and was a trust officer, are given corporate credit cards by U.S. Bank that are to be used for business expenses. They are to be zeroed out at the end of each month. Some employees are allowed to use the corporate credit card to do things like buy a putter for a valued trust customer, which is one of the things Mr. Sullivan used his credit card for. That was a client gift for a gentleman named Warren McCain, who is — whose account is worth a lot of money to U.S. Bank, and it's a customary business kind of thing to do. The practice at U.S. Bank and the undisputed evidence in the record is that if an employee with a corporate credit card uses the corporate credit card for business expenses, they should expense that out with their expense account submitted monthly. At the time that Sullivan was supervising Brock Bank, he did not see her corporate credit card statement. He simply saw her expense account, which he approved. Occasionally, employees like Mr. Sullivan, on occasion, would pull the wrong credit card out of their wallet. If that happened, they immediately reported it and reimbursed the bank for having charged something on the incorrect credit card instead of their own personal card, and they were not terminated for those reasons. Now, I think the timing on this case is extremely important, and I want to review what is set forth in our brief as to the chronology of events. Before I get to that, though, however, let me go back to your statement on Mr. Sullivan and the golf putter. So we have his statement of what he was doing, but then wasn't there a statement by his assistant that she viewed it as improper use of the credit card? I do not believe his assistant, Melody Rogers, was employed at the time that Mr. Sullivan purchased that putter for Mr. --" for the client that he bought it for. I believe Ms. Rogers, who was employed from 2003 and 2005, and who is the source of the recitation of the alleged ageist comments concerning Brockbank, I don't think she had any knowledge of that putter. If she did, as an administrative assistant, I think that the Vice President, Mr. Sullivan, had the --" and his boss, had the power to overrule her in approving the --" that kind of a client gift. Ginsburg. I mean, that may be true, but I'm just looking at factual issues that they would say. Yes, ma'am. I mean, you may be right that they would say this individual might have eagle eyes, but doesn't have any authority. Yes, Your Honor. So but I'm just not sure that's in the record when we have her test. I'm looking at, you know, at her deposition. And I apologize. I don't have the exact recollection of what Ms. Rogers said. I think if she did say she felt the --" that Sullivan's purchase of the putter was a violation, I don't think that creates a sufficient question of fact as to a disparate application of the corporate credit card policy based on discriminatory animus, which is what needs to be proven in this case. The fact of the matter is, counsel stated that the alleged use of the putter and the alleged aegis comments by Mr. Sullivan progressed from 2003 through 2007. And I think Ms. Rogers' testimony only covers the period 03 to 05. Mr. Sullivan did have a review with the plaintiff in April of 07 in the SER 53 and 42, put her on an action plan, and said, you're not a trust officer off the street. Now, he was misquoted, Mr. Sullivan, in the district court's opinion in some briefs as saying, you're not a young trust officer off the street. But what he said was, you're not a trust officer off the street. Let's get going here. And he put her on an action plan. He took her off that action plan, even though she had not met the requirements in October of 07. She was supposed to make certain milestones by September of 07, and she had not. He extended it to October of 07, and even though she had not met the goal. And that's in the supplemental excerpt of record, volume 2, page 94, volume 1, 43, 44, and 57. What about Ms. Rogers, who said that he told her that he would like to replace Ms. Bruckbank with somebody younger? I believe that Mr. — that that is the evidence in the record with Ms. Rogers, and that happened while Ms. Rogers was employed. Her employment ended in 2005. Now, let me address what I think is the crux of this. I mean, if the — all of this, it sort of raises these factual — I mean, everything is like, well, there's this, but there's an explanation for it, or she didn't have the authority, or maybe there was a supervisor that said it's okay. I'm having some trouble untangling why the facts are undisputed, and maybe you can address that. Thank you, Your Honor. I'd be happy to. The facts are undisputed for this reason. The only evidence in the record that Mr. Sullivan was, quote, involved in the decision to terminate is the fact that after the plaintiff, Bruckbank herself, initiated a human resources inquiry into Bruckbank's use of the credit card, human resources did its job. In 2009, far distanced from any stray remarks, far distanced from Melody Rogers' testimony, Bruckbank initiated the inquiry because she couldn't pay off her corporate credit card, another rule of the bank which she wasn't following. Darlene Bill started looking into it. She checked with her supervisor, Linda Matthews. They looked at the corporate credit card charges. They violated the policy in Bill's and Matthews' opinions. Bill's and Matthews' had to be ---- By not paying things off? Not only by not paying things off, by charging things like home cable service, home Internet service. She had no VPN access to the bank. She admitted that. She admitted, Bruckbank admitted in her deposition, the plaintiff's excerpt of Record Volume 3, page 386, her deposition, pages 13 through 19, that cable services at home were not approved. She admits on the excerpt of Record Volume 3, page 389, that she'd been told to get her Verizon charges off of her corporate credit card, and she tried, but she hadn't gotten it done. She admitted she had stuff on there that was not supposed to be there. So far, this is all confined to Bruckbank, Bill's, and Matthews. As is U.S. Bank's custom, they then notified Mike Sullivan, and he sat with the employee, Ms. Bruckbank, while they reviewed all these items with her. Her response was, well, I was trying to pay off my personal charges, these charges, I don't know that she said personal, with my mileage. He did not make the decision. He did not sign off on the decision. The decision was recommended to him by Human Resources, and because of the management structure, he had to okay it.  But then he was the final decision-maker. Blackman. I would say, Your Honor, the final decision-makers were the three people involved, Arlene Bills, Linda Matthews, and Mike Sullivan. But, and you could say, as her manager, he was the final decision-maker. He didn't see it that way. His testimony was that he was involved. Let's go back to this fellow Sullivan and his own problems with credit cards. Yes, sir. Are all of his problems with credit cards explainable, that they were all gifts for clients, business-related expenses? Except for on, I believe, one occasion, he mistakenly used the wrong card and reported it immediately and repaid, paid off the charge. You also, in your remarks just now, indicated that Ms. Brobank had been told earlier that she was not approved for home use of the computer. Was that correct? She was not approved, sir, for home Internet access to the bank, which has tremendous firewalls. She used her personal e-mail account from her personal home to e-mail customers, and she claimed that was justification for the bank paying for all of her Internet service, her virus protection, and everything else, and putting all that on her home credit card. But that was not authorized by the bank. The access to the bank. She had never been told not to do that before she did. Yes, she had. And that's in her deposition on page, Excerpt of Record 3, Volume 3, submitted by the appellant, page 386, Brock Bank Deposition, pages 13 through 19. So what we have here are, in viewing them in light of the plaintiff's possibly ageist remarks back in 2005, but then we have a consistently enforced U.S. Bank policy concerning corporate credit cards, a serious matter, that the investigation's initiated because Brock Bank is not paying off the credit card. She's supposed to. It's investigated by people who have no relationship or involvement in anything else like this. But it's not a zero-tolerance policy, because if somebody inadvertently pulled out their credit card, for example, there was an employee who inadvertently or explained that that employee inadvertently paid for gas at a gas station with her credit card, then U.S. Bank would let that go. So it's case-by-case basis, it sounds like. Is that not correct? Your Honor, as I understand it, it is a zero-tolerance policy for deliberate misuse. If it is accidental and the employee comes forward and explains it, it is they are not disciplined. And there's nothing in the record about what happens if there are multiple occasions of, quote, inadvertent misuse. But I believe the record is clear that it is zero-tolerance for using the corporate credit card for personal expenses not authorized by the bank, even though Brock Bank disputes them. And another key point here is — Yes, we do, Your Honor. One of them was a, I believe, a teller named Michelle Waltman, and she had deliberately used her corporate credit card to purchase a birthday gift when she was taking her daughter to a birthday party on a weekend. And then when she went to pay that off, she was terminated. I don't recall at this time the details of the other person who was terminated before Brock Bank, the person who was terminated after Brock Bank was terminated for paying for meals for her family while traveling on U.S. business. U.S. Bank business. But I think it's clear —  Yes, ma'am. I'm sure that the record is clear. You earlier indicated, if I heard you correctly, that with regard to Sullivan's use of the cards, they were all legitimate gifts except for one occasion. And what was that one occasion? I believe the one occasion was when he took the credit card, used the corporate credit card to pay for something at a — Is that the pizza situation? The pizza situation. I think it was a pet. I think he did a pet thing, too, for his pet. Maybe a boarding thing, and then he used the — Okay. So the pizza was not improper? No. And in fact — What I just talked about? Using your corporate credit card to buy meals for fellow employees would occasionally be approved by a supervisor, known or unknown. And the last thing I want to say is Darlene Bills, whether right or wrong, there is no recommendation, as well as Linda Matthews, to terminate Ms. Brockbank based on her — what Ms. Bills believed to be violation of the corporate credit card policy was motivated in any way by animus towards her because of her age or gender. And that is essential in order to overcome the Reeves pretext plus standard. Thank you. Thank you. I think you have a small amount of time for rebuttal, if you want. I agree. Thank you, Justice McConnell. The reality is, as I think we heard during defense counsel's argument, yeah, there may be explanations for a lot of what happened, but those explanations go both ways, and that's precisely why summary judgment should not have been granted here. In the district court's opinion, Judge Lodge points out there seems to be a patchwork of facts, the inferences of which could lead a jury to believe there was age discrimination afoot. Despite making that statement in his opinion, Judge Lodge goes on farther to say, but if we read the rest of the deposition or a countervailing point in the same deposition, then the context shows it's not really age discrimination. That's not the trial judge's role. That's the jury's role. And based on that, it would not be proper to allow this summary judgment order to stand. There is one point on this credit card policy that needs to be highlighted that also shows what a pretext it is. It was Sullivan's job to okay all of Sharon Brockbank's expenses, and he did every time. He authorized her expenses every time. U.S. Bank says we had a zero-tolerance policy. Our policy required that the credit card be zeroed out at the end of each month. Well, the evidence is clear in the record. Even by Sullivan's own admission, he was regularly late in reviewing Sharon Brockbank's expense reports. So of course her credit card didn't zero out every month, because he was the one responsible for reviewing it and authorizing it, and he was regularly late in doing so. Thank you. Thank you for your time. The case of Brockbank v. U.S. Bancorp is submitted. I appreciate both of you coming from Idaho and arguing before us this morning.
judges: Ripple, McKeown, Nguyen